UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case. |
| KAMMI RAY FORD, | ) | No. 18-40514-JMM |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| GARY L. RAINSDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Case. |
| v. | ) | No. 19-8030-JMM |
| | ) | |
| TODD GEARHEART, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Appearances:**

Heidi Buck Morrison, RACINE OLSON PLLP, Pocatello, Idaho, attorney for Trustee.

David Heida, WHITE, PETERSON, GIGRAY & NICHOLS, Nampa, Idaho, attorney for Defendant.

MEMORANDUM OF DECISION − 1

### *Introduction*

On May 3, 2019, chapter 7[1] trustee, Gary L. Rainsdon ("Plaintiff") commenced this adversary proceeding seeking to avoid as fraudulent a transfer of real property from bankruptcy debtor Kammi Ray Ford[2] ("Debtor"), to her ex-husband, Todd Gearheart ("Defendant").  Plaintiff does so under the Bankruptcy Code and Idaho's Uniform Fraudulent Transfer Act and pursues recovery of the property or its value for the benefit of Debtor's creditors.  The Court conducted a trial on the matters alleged after which the parties filed written closing arguments, and the matter was deemed under advisement.

Having considered the memoranda, testimony, evidence, and arguments submitted to the Court, as well as the applicable law, the Court makes the following findings of fact and conclusions of law which resolves the issues presented.  Fed. R. Bankr. P. 7052; 9014.

### *Findings of Fact*

Debtor married Defendant on June 6, 2003.  Ex. 101.  During their marriage, the couple purchased two homes.  At some point, they purchased a residence located at 1120 Kelly Avenue in Kimberly, Idaho ("Kelly Property").  Ex. 101.  On June 11, 2009, they purchased a home located at 226 Teton Street in Twin Falls, Idaho ("Teton Property").

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

[2] Ms. Ford now uses the surname of Davis.

MEMORANDUM OF DECISION – 2

Ex. 100.  Debtor testified that she was unsure of what they paid for the Teton Property, but recalled that the asking price was $139,000.  While Debtor and Defendant resided at the Kelly Property, Debtor's mother, Carol J. Evans ("Evans") moved into the Teton Property shortly after its purchase and has resided there ever since.  Both Debtor and Defendant testified that Evans did not pay rent but resided at the Teton Property free of charge in exchange for babysitting services.  At one point, a lease agreement was drafted, but it was done in order to assist Evans in qualifying for food stamps.  Debtor testified that if Evans ever paid any rent, it was returned to her.

On July 31, 2014, Debtor and Defendant divorced.  Ex. 101.  The property settlement associated with the divorce awarded both the Kelly Property and the Teton Property to Debtor, and Defendant was obligated to pay off the Teton Property mortgage and provide fee simple title to Debtor on or before February 1, 2015.  *Id.*  Defendant did so and executed a quitclaim deed to Debtor on January 9, 2015, giving her fee simple title to the Teton Property.  Ex. 102.  An amended quitclaim deed was executed on February 10, 2015.  Ex. 103.  Both deeds were recorded in Twin Falls County.  Exs. 102–03.

On January 30, 2017, Debtor married Zachery Ford ("Ford").  They later divorced on December 12, 2018.  Prior to the marriage, Debtor and Ford entered into a prenuptial agreement, which described the Kelly Property, valued at $244,000, and the Teton Property, valued at $150,000, as Debtor's separate property.  Ex. 104 at ¶ 2.02(a) and Schedule A.  In arriving at the value for the Teton Property, Debtor testified there was no

MEMORANDUM OF DECISION – 3

formal valuation process, such as an appraisal or broker's price opinion; rather, she pulled the number "out of the air."

On November 30, 2017, during Debtor's marriage to Ford, she sold the Teton Property back to Defendant and transferred it to him via quitclaim deed.  Ex. 105.  At trial, she explained that she made the transfer because she has never been good with money, the house needed repairs, she was behind on the property taxes, and her mother was 76 years old and disabled and in need of a place to live.  Although there was no life estate included in the quitclaim deed, Debtor testified that the transfer was made with the understanding that Defendant would let Evans live at the Teton Property for the rest of Evans' life and not charge her rent.  She testified that she could trust Defendant to do the right thing.

Debtor and Defendant agreed on a sale price of $90,000.  The purchase price was paid in several portions, including checks for $5,000 paid to Debtor on November 30, 2017, $5,000 on December 8, 2017, $34,150 on February 5, 2018, and $45,000 on March 9, 2018.  Exs. 110; 112– 13; 201; 210.  The total of those checks is $89,150, and Defendant testified the remaining balance was paid to Debtor in cash.  An additional requirement imposed by Defendant on Debtor was that she complete 30 days at the Walker Center, an addiction treatment facility.  On December 29, 2017, Defendant wrote a check to Debtor in the amount of $1,400 to pay for this treatment.  Exs. 111; 201.  Defendant testified that he did not want to buy the Teton Property, but wanted Debtor to

MEMORANDUM OF DECISION – 4

get help at the Walker Center and believed this was the only way to accomplish that.  By his estimation, he could have charged $1,000 per month in rent for the Teton Property.

In arriving at the $90,000 price, no appraisals or other formal valuation occurred. A 2015 assessor's notice valued the Teton Property at $136,150.  Ex. 109.  However, Debtor testified that the home needed a number of repairs, which decreased the actual value of the home.[3]  No estimated cost for the repairs was set forth, and no contractor was consulted.  Finally, in setting the purchase price, Debtor included the fact that her mother was going to be permitted to occupy the Teton Property rent-free for the remainder of her life, alleviating her responsibility to pay her mother's rent.  She testified that she believed $90,000 to be a fair price.

Following the transfer, Debtor spent the entire $90,000 between November 30, 2017 and June 2018.  Ex. 202.  On June 15, 2018, she filed a chapter 7 bankruptcy petition.  *In re Ford,* 18-40514-JMM; Exs. 107; 203.  On her schedules, in terms of real property, she claimed ownership of only the Kelly Property, valued at $230,000 with a mortgage of $185,342 at the time, leaving her with about $45,000 in equity.  *Id.*  In her Statement of Financial Affairs, she disclosed the 2017 sale of the Teton Property to Defendant.  *Id.*  At the time of the filing, Debtor had personal property worth $1,025, $78

---

[3] Debtor testified generally about an exhibit that detailed some of the needed repairs to the Teton Property, but the exhibit was never admitted at trial, and as such, the Court will not consider the particulars contained thereon.

MEMORANDUM OF DECISION − 5

in her bank account, and listed $76,715 in unsecured debt. *Id.* Finally, her net monthly income was $ -183.71. *Id.*

On November 30, 2017, the date of the Teton Property transaction, Debtor owned the Kelly Property and believed she owed about the same amount and had the same equity as she did when she filed her bankruptcy petition the following June. On November 30, 2017, Debtor was leasing a Toyota Rav 4, but was under water on the vehicle and later turned it back in because she was behind on the payments. Her bankruptcy schedules reflect a deficiency owed on the Rav 4 in the amount of $7,288, and the Statement of Financial Affairs reflects that the vehicle was repossessed in May 2018. Exs. 107; 203. She testified she was likely behind on the payments on November 30, 2017. Finally, she listed $76,715 in unsecured debts on her bankruptcy schedules, which she testified was roughly the same as she had on November 30, 2017. Her Farmer's Bank account had $51.32 on November 29, 2017, and $4,529.51 the following day after depositing two checks for $100 and $5,000 respectively. Ex. 210. The $5,000 check was the first payment from Defendant for the Teton Property.

On May 3, 2019, Trustee commenced this adversary proceeding, seeking to avoid the November 30, 2017 transfer of the Teton Property from Debtor to Defendant under § 548 and Idaho's Uniform Fraudulent Transfer Act, Idaho Code § 55-913. He requests turnover of the Teton Property or its value under § 542. Dkt. Nos. 1; 5.

MEMORANDUM OF DECISION – 6

### *Conclusions of Law and Disposition*

In his adversary complaint, Plaintiff invokes §§ 548(a)(1)(A) and (B), as well as the Idaho Uniform Fraudulent Transfer Act, as grounds for avoidance of the transfer. The Court will consider each of these in turn.

A.     Section 548(a)(1)(A)

In his Amended Complaint, Plaintiff alleges the Debtor "transferred the property to the Defendant with the actual intent to hinder, delay, or defraud her creditors." Dkt. No. 5 at ¶ 15.  This allegation invokes § 548(a)(1)(A) which provides, in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

The trustee bears the burden of proving, by a preponderance of the evidence, all of these statutory requirements. *Crawforth v. Wheeler (In re Wheeler)*, 444 B.R. 598, 605 (Bankr. D. Idaho 2011) (citing *Murrietta v. Fehrs (In re Fehrs),* 391 B.R. 53, 73 (Bankr. D. Idaho 2008)).

Applying this legal standard to the facts presented, it is clear several of the elements are not disputed and are proven.  The Teton Property was an interest of the Debtor, as she owned it in fee simple beginning in January 2015.  Exs. 102– 03.  There is also no question that she transferred that interest to Defendant when she executed the quitclaim deed.  Exs. 105; 107; *Fehrs*, 391 B.R. at 73 (the Code defines "transfer"

MEMORANDUM OF DECISION − 7

broadly in § 101(54), and the granting of a quitclaim deed is a transfer for the purposes of § 548(a)(1)(B)). Finally, the transfer occurred on November 30, 2017, and the quitclaim deed was recorded on December 1, 2017, dates which fall on or within two years of June 15, 2018, the bankruptcy filing date. Ex. 105; *see also* § 548(d)(1) ("[A] transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee . . . .").

Where the analysis becomes more difficult is the proof of "actual intent to hinder, delay, or defraud" Debtor's creditors. The Court heard no evidence of actual intent to hinder, delay, or defraud. Because direct evidence of such intent is rare, however, courts may infer the necessary intent from the circumstances surrounding the transfer. *Hasse v. Rainsdon (In re Pringle),* 495 B.R. 447, 467 (9th Cir. BAP 2013) (citing *Acequia, Inc. v. Clinton (In re Acequia, Inc),* 34 F.3d 800, 805–06 (9th Cir. 1994)). These inferences may be drawn from the presence of certain traditional "badges of fraud" such as, (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer. *Hopkins v. Crystal 2G Ranch, Inc. (In re Crystal)*, 513 B.R. 413, 418 (Bankr. D. Idaho 2014).

MEMORANDUM OF DECISION − 8

The Court concludes several of these badges of fraud exist. Considering the property Debtor listed on her bankruptcy schedules, filed about seven months after the transfer, there is no question that the Teton Property represented her largest asset, and, aside from her modest personal belongings, her only unencumbered one. While she also owned the Kelly Property, it was burdened with a mortgage, leaving her only about $45,000 in equity. She had no other significant assets. Moreover, as will be discussed below, Debtor was insolvent on the date of the transfer. Finally, it is clear there is a special relationship between Debtor and Defendant. While they are ex-spouses, it is evident that Defendant has continued to be kind to Debtor, including providing the means and motivation for Debtor to get help at the Walker Center, giving her money from time to time, and providing a home for Evans. While the marriage did not last, it seems a convivial relationship has endured.

While the presence of a single badge of fraud may spur mere suspicion, the existence of several can constitute conclusive evidence of actual intent to defraud. In this case, the Court concludes there is sufficient circumstantial evidence to infer intent to hinder, delay, or defraud Debtor's creditors. Having established the requisite indicia of fraud, the burden shifts to the Defendant to prove some "legitimate supervening purpose" for the transfers at issue. *In re Crystal,* 513 B.R. at 418 (citing *Acequia, Inc.*, 34 F.3d at 806 (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254 (1st Cir. 1991))). In this case, and under these facts, the Court finds Debtor has demonstrated a legitimate purpose for the transfer. The evidence clearly demonstrated

MEMORANDUM OF DECISION − 9

Debtor's awareness of her poor track record in handling money as well as her desire to look after her elderly, disabled, mother, considering it her moral duty to ensure her mother had a place to live. Moreover, the evidence was undisputed that Debtor implicitly trusted Defendant to do the right thing and permit Evans to live in the home rent-free for the remainder of her life. As such, the Court concludes a legitimate intervening purpose mitigates the presence of the badges of fraud, and Plaintiff is not entitled to avoidance under § 548(a)(1)(A).

B.    Section 548(a)(1)(B)

Plaintiff also seeks to avoid the transfer of the Teton Property under 548(a)(1)(B) which provides, in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property … that was made or incurred within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— … (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation incurred, or became insolvent as a result of such transfer or obligation….

*Crystal*, 513 B.R. at 418.

To avoid a transfer under this provision, Plaintiff must demonstrate that 1) there was a transfer of Debtor's property within two years of the filing of her bankruptcy petition, 2) that Debtor received less than reasonably equivalent value in exchange for the transfer, and 3) that Debtor was insolvent on the date of the transfer, or the transfer caused her to become insolvent. *Gugino v. Rowley (In re Floyd)*, 540 B.R. 747, 758 (Bankr. D. Idaho 2015) (citing *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 440

MEMORANDUM OF DECISION − 10

(Bankr. D. Idaho 2008)).  Plaintiff bears the burden of proving all § 548(a)(1)(B)

elements by a preponderance of the evidence.  *Rainsdon v. Garcia (In re Garcia),* 465

B.R. 181, 190–91 (Bankr. D. Idaho 2011) (citing *Jordan,* 392 B.R. at 440, 447 (citing

*Krommenhoek v. Natural Res. Recovery, Inc. (In re Treasure Valley Opportunities, Inc.),*

166 B.R. 701, 703 (Bankr. D. Idaho 1994))).

     As noted above, there is sufficient evidence of a transfer of Debtor's property

within two years of the filing of her bankruptcy petition, and so the Court will focus on

the remaining requirements.

     *1.  Receipt of Reasonably Equivalent Value*

     In order to prevail, Plaintiff must demonstrate that Debtor received less than

reasonably equivalent value in exchange for the transfer of the Teton Property to

Defendant.  The Court employs a two-step process in conducting this analysis.  *Jordan,*

392 B.R. at 441.  First, the Court must determine whether Debtor received value in

exchange for the transfer, which for the purpose of § 548 is defined to mean "property, or

satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2).  "A

transfer is for value if one is the quid pro quo of the other."  *Fehrs,* 391 B.R. at 74;

*Gugino v. Ortega (In re Pierce)*, 428 B.R. 524, 530 (Bankr. D. Idaho 2010).  Because

Debtor received $90,000 from Defendant as payment for the property, the Court finds

this constitutes receipt of value in exchange for the transfer for the purposes of

§ 548(a)(1)(B).

MEMORANDUM OF DECISION – 11

The Court turns next to the question of whether the value received by Debtor was reasonably equivalent to the value of the transferred property.  In analyzing reasonable equivalence, the Court must consider all the circumstances surrounding the transfer in question, *Fehrs*, 391 B.R. at 74, and the determination of reasonable equivalence must be made as of the time of the transfer, *Treasure Valley Opportunities, Inc.,* 166 B.R. at 704. In making this determination, the Court must consider the net effect of the transfer on the bankruptcy estate funds available for the debtor's unsecured creditors.  *Jordan,* 392 B.R. at 441.  In general, if a party gets "roughly the value it gave," it has received reasonably equivalent value, and indirect financial benefits may constitute value if they confer an economic benefit on the Debtor.  *Id.* at 441–42 & n. 26.  The Plaintiff has the burden of showing that the value Debtor received was not reasonably equivalent to the value of the transferred property.  *See Crystal*, 513 B.R. at 419; *Fehrs,* 391 B.R. at 73.  While this involves a question of fact, the Court is accorded wide discretion in making this determination.  *Pierce,* 428 B.R. at 530 (citing *Jacoway v. Anderson (In re Ozark Rest. Equip. Co.),* 850 F.2d 342, 344 (8th Cir. 1988)).

### a.  The Value of the Teton Property

Before the Court can decide whether reasonably equivalent value was given, the value of the Teton Property as of the time of the transfer must first be established. Plaintiff introduced two pieces of evidence on this matter:  a 2015 assessment indicating the property was valued at $136,150, and a January 2017 prenuptial agreement, in which Debtor valued the Teton Property at $150,000.

MEMORANDUM OF DECISION – 12

To dispute this evidence, Debtor testified that the $150,000 figure was based on nothing specific and was just a made-up number. In addition, Debtor asserts that the Teton Property was in need of a number of repairs which decreased its value. However, the nature of those repairs, their estimated cost, and the impact of those needed repairs on the value of the property as of the transfer date was not established at trial. Accordingly, the Court will utilize the 2015 assessed value of $136,150, as it represents the best evidence of the value of the Teton Property on November 30, 2017.

### b. The Value Given for the Property

The record supports a finding that Defendant paid Debtor $90,000[4] for the Teton Property. Because the price paid falls $46,150 short of the established value of the property, Plaintiff has established a prima facie case that reasonably equivalent value was not provided for the transfer. The burden then shifts to Defendant to challenge this evidence. In response, Defendant makes several arguments. The Court will consider each one.

### i. Closing Costs and Realtor Fees

First, Defendant points to the fact that the transfer occurred with no closing costs or realtor commissions, which would ordinarily be factored in. While the transfer was made via execution of a quitclaim deed, Defendant provided no specific estimate of the

---

[4] Although the sum of the checks written by Defendant to Debtor for the purchase of the Teton Property total $89,150, Defendant competently testified that he paid the remaining balance of the $90,000 purchase price to Debtor in cash. As such, the Court will consider the purchase price to be $90,000.

MEMORANDUM OF DECISION − 13

amount Debtor saved by transferring the property in this way to assist the Court in its calculations.

### ii. Life Estate

Next, Defendant claims the life estate he promised to Evans adds greatly to the value of the transaction to Debtor.  Debtor testified that she was never good with money and did not want to have to worry about her moral—though not legal—duty to her mother to provide a place for her to live.  The record clearly establishes the existence of the oral life estate and that it had value to Debtor.  The closer question is whether the value of the life estate may be considered by the Court in conducting a § 548(a)(1)(B) analysis, and whether the oral, non-recorded nature of this particular life estate affects that value.

In general, an oral life estate is unenforceable as it violates the statute of frauds.  Pursuant to Idaho Code § 9–503, Idaho's codification of the statute of frauds for real estate transactions,

> No estate or interest in real property, other than for leases for a term not exceeding one (1) year, nor any trust or power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

The Idaho Supreme Court has held that "[f]ailure to comply with the statute of frauds renders an oral agreement unenforceable both in an action at law for damages and in a suit in equity for specific performance."  *Wakelam v. Hagood*, 151 Idaho 688, 691,

MEMORANDUM OF DECISION − 14

263 P.3d 742, 745 (2011) (quoting *Hoffman v. SV Co., Inc.,* 102 Idaho 187, 190, 628 P.2d

218, 221 (1981)).  Because Evans' life estate was not included on the quitclaim deed, as

against both Plaintiff as the bankruptcy trustee and Debtor's creditors, the life estate

verbally reserved for Evans is facially invalid, at least in actions for damages and specific

performance.

     Defendant counters, arguing the life estate is valid based on the doctrine of part

performance under Idaho Code § 9-504, which provides that the statute of frauds "must

not be construed to . . . abridge the power of any court to compel the specific

performance of an agreement, in case of part performance thereof."  According to the

theory of part performance, when an agreement to convey real property fails to meet the

requirements of the statute of frauds, the agreement may nevertheless be specifically

enforced when the purchaser has partly performed the agreement.  *Hoke v. Neyada, Inc.*,

161 Idaho 450, 453–54, 387 P.3d 118, 121–22 (2016) (citing *Bear Island Water Assoc.,

Inc. v. Brown*, 125 Idaho 717, 722, 874 P.2d 528, 533 (1994)).

     In order to invoke the doctrine of part-performance, (1) the underlying agreement

must be clearly established, and (2) the partial performance must be sufficient, shown by

clear and convincing evidence, and directly referable to the established oral agreement.

*Sec. Inv'r Fund LLC v. Crumb*, 165 Idaho 280, 288, 443 P.3d 1036, 1044 (2019); *Simons

v. Simons*, 134 Idaho 824, 827, 11 P.3d 20, 23 (Idaho 2000).  "The most important acts

which constitute a sufficient part performance are actual possession, permanent and

MEMORANDUM OF DECISION − 15

valuable improvements and these two combined." *Simons*, 134 Idaho at 827, 11 P.3d at 23 (quoting *Roundy v. Waner*, 98 Idaho 625, 629, 570 P.2d 862, 866 (Idaho 1977)).

Here, the testimony of both Debtor and Defendant established their intent to create a life estate for Evans, and the fact that she has continued to live on the Teton Property for years after the transfer and pursuant to that understanding supports the doctrine of part performance.

While this is not an action for specific performance of that agreement, because the life estate may be enforceable, at least in terms of the statute of frauds, Defendant contends that the Court should consider Evans' life estate as part of the consideration for the transfer.  This raises two additional issues:  First, can the Court consider intangible consideration, such as the creation of a life estate for a third party, and second, is Evans' life estate a form of advance?

### (a)  Intangible Consideration

Whether Debtor received a reasonably equivalent value is analyzed from the point of view of her creditors, because the function of this element is to permit avoidance of those transfers that result in a diminution of Debtor's prepetition assets.  *Fehrs,* 391 B.R. at 74 (citing *Hopkins v. D.L. Evans Bank (In re Fox Bean Co., Inc.)*, 287 B.R. 270, 281 (Bankr. D. Idaho 2002) (citing *Roosevelt v. Ray (In re Roosevelt),* 176 B.R. 200, 206 and 208 (9th Cir. BAP 1994))).  Beyond the straightforward *quid pro quo* exchange, the Court may consider the value of all benefits inuring to the Debtor by virtue of the transaction in question, directly or indirectly.  *Fox Bean Co., Inc.*, 287 B.R. at 281 (citing

MEMORANDUM OF DECISION – 16

*Pummill v. Greensfelder, Hemker & Gale* (*In re Richards & Conover Steel, Co.*), 267
B.R. 602, 612–13 (8th Cir. BAP 2001)); *Pierce*, 428 B.R. at 532.

In *Frontier Bank v. Brown (In re N. Merch., Inc.),* the Ninth Circuit recognized
that "reasonably equivalent value can come from one other than the recipient of the
payments, a rule which has become known as the indirect benefit rule." 371 F.3d 1056,
1058 (9th Cir. 2004) (quoting *Harman v. First Am. Bank (In re Jeffrey Bigelow Design
Grp., Inc.),* 956 F.2d 479, 485 (4th Cir. 1992)). Nevertheless, "the primary focus of
Section 548 is on the net effect of the transaction on the debtor's estate and the funds
available to the unsecured creditors." *Id.* at 1059. As such, in determining whether
Debtor received reasonably equivalent value for the transfer of the Teton Property, "the
analysis is directed at what the debtor surrendered and what the debtor received
irrespective of what any third party may have gained or lost." *Wyle v. C.H. Rider &
Family (In re United Energy Corp.),* 944 F.2d 589, 597 (9th Cir. 1991) (internal
quotation marks and citations omitted). Accordingly, the direct benefit to Evans is not
part of the Court's calculations.

This Court has previously held that indirect benefits to the debtor may constitute
value in some cases, but the benefit has to be "sufficiently concrete and identifiable" and
"reasonably equivalent" from the point of view of Debtors' creditors. *Floyd*, 540 B.R. at
758; *Crystal*, 513 B.R. at 419 ("indirect financial benefits constitute value if they confer
an economic benefit on the debtor.")

In *Frontier Bank,* the Ninth Circuit provided this example:

MEMORANDUM OF DECISION − 17

> a debtor may sometimes receive "fair" consideration even though the
> consideration given for his property or obligation goes initially to a third
> person … although transfers solely for the benefit of third parties do not
> furnish fair consideration … the transaction's benefit to the debtor need not
> be direct; it may come indirectly through benefit to a third person…. If the
> consideration given to the third person has ultimately landed in the debtor's
> hands, or if the giving of the consideration to the third person otherwise
> confers an economic benefit upon the debtor, then the debtor's net worth
> has been preserved, and [the statute] has been satisfied—provided, of
> course, that the value of the benefit received by the debtor approximates the
> value of the property or obligation he has given up.

371 F.3d at 1058–59 (quoting *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979,

991–92 (2d Cir. 1981) (internal quotation marks and citations omitted)).

The Court's focus, then, is the net effect of the transaction on Debtor's estate and

her creditors, i.e., whether the transaction has depleted the bankruptcy estate.

The evidence at trial was clear that Evans' tenure in the Teton Property began with

a corresponding duty imposed on her that directly benefitted both Debtor and Defendant

when they were married: Evans provided babysitting services for the couple's children.

The Court presumes that they would have had to pay an outside provider for such

childcare had Evans not assumed that role. As such, the provision of a life estate to

Evans may have conferred an economic benefit upon Debtor, saving her the burden of

childcare expenses. However, the evidence of whether Evans continued to provide

babysitting services to Debtor after the November 2017 transfer, and the market value of

those services, is wholly lacking. Moreover, § 548(d)(2) defines "value," for the

purposes of § 548, to exclude "an unperformed promise to furnish support to the debtor

or to a relative of the debtor." *See also In re Pringle*, 495 B.R. at 464. As a result, the

MEMORANDUM OF DECISION − 18

Court cannot calculate the benefit to Debtor's estate of any such services. In the absence of any evidence regarding an economic benefit to Debtor, the Court finds the life estate provides no value to support a finding of reasonable equivalence.

### (b)  Present Advance

Defendant offers an additional argument, specifically that the life estate is an advance of the purchase price. In general, a promise of future support is not considered a fair equivalent of property transferred. *Schmitt v. Morgan,* 98 A.D. 2d 934, 936, 471 N.Y.S.2d 365, 367 (1983). The Second Circuit has held that the promise of specific future services over a certain period of time can in certain instances constitute a "present advance" when they are of a fixed and definite nature. *In re Ventimiglia*, 362 B.R. 71, 83 (Bankr. E.D.N.Y. 2007) (citing *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1060–61 (2d Cir. 1995)). Although Defendant did not clearly articulate this argument, the Court presumes he contends that his grant of a life estate to Evans is an advance payment toward the purchase price of the Teton Property. When considering the value of consideration given to support a transfer of property, Idaho case law has permitted present advances by the transferees and antecedent debts owed to the transferee by the debtor to be included in the calculation. *Mohar v. McLelland Lumber Co.*, 95 Idaho 38, 41, 501 P.2d 722, 725 (1972).

It is doubtful, however, that the life estate for Evans could be deemed a promise of specific future services for a "fixed and definite nature," as it is unclear how long Evans will live. More to the point, the Court is required to consider the circumstances as of the

MEMORANDUM OF DECISION − 19

time of the transfer, so the length of time that Evans has occupied the home since the transfer is irrelevant here.

While she considers it her moral duty to provide a place for her mother to reside, Debtor admitted at trial that she has no legal duty to do so. Consequently, the Court cannot see any benefit to Debtor's creditors resulting from Evans' life estate.

### iii.  Credit for Foregone Rental Payments

Defendant also contends that he ought to receive some sort of credit towards the purchase price for rental payments he has foregone. He testified that he believed he could rent the home for $1,000 per month, and that he could have made $36,000 by the time of trial. By his calculations, Defendant paid $90,000 to Debtor in cash, and, via the life estate, has foregone rental income of $36,000. Combining these two figures, Defendant claims that he has provided $126,000 in value.

The Court concludes he is not entitled to any such credit for three reasons. First, regardless of whether the § 548 analysis permits consideration of this type of credit, it is clear there was no lease agreement between Defendant and Evans, as the one apparently written up when Defendant and Debtor were still married was drafted only with the intent of qualifying Evans for food stamps. The evidence is clear it was never enforced. Second, the amount of potential rent was unsubstantiated, as Defendant testified without any basis about what he believed was the rental value of the Teton Property. Moreover, the testimony was clear from both Debtor and Defendant that the agreement was to allow Evans to live in the Teton Property in exchange for babysitting services, but again, it is

MEMORANDUM OF DECISION − 20

not clear whether Evans continued to babysit Debtor's children after the November 30,

2017 transfer, nor was there evidence of the value of any such services.  Finally,

reasonable equivalence is determined as of the time of the transfer, and Defendant had

not foregone any rent at that time, and if he had, any rental value that Defendant could

have received would not inure for the benefit of Debtor's creditors or bankruptcy estate.

In summary, Plaintiff has proven that Debtor received $90,000 for a home worth

approximately $136,000.[5]  While the property needed repairs, the extent and cost of those

repairs was not established.  Any indirect benefit received by Debtor for her mother's life

estate in the home was also not sufficiently established.  Accordingly, Plaintiff has

proven that Debtor did not receive reasonably equivalent value for the transfer of the

Teton Property to Defendant on November 30, 2017.

---

[5] Defendant advocated that this Court ought to apply the so-called *Madrid* rule, which allegedly holds that if the purchase price is at least 70 percent of the value of the property, then it constitutes reasonably equivalent value.  *Lawyers Title Ins. Co. v. Madrid (In re Madrid)*, 21 B.R. 424, 425 (9th Cir. BAP 1982), *aff'd,* 725 F.2d 1197 (9th Cir. 1984).  However, *Madrid* discussed the so-called 70 percent rule, announced in *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d 201 (5th Cir. 1980), and specifically noted that *Durrett* cited only a single case in support of the proposition.  Moreover, while the BAP suggested it may be valid to hold that less than 70 percent of fair market value is not a fair equivalent for a private transfer to an insider, it found that proposition "questionable" with regard to regularly conducted public sales.  Thus, the BAP's comments about the *Durrett* rule is dicta.  More particularly with regard to the facts of this case, the Court concluded that Defendant may not count the $36,000 in alleged foregone rent in the reasonable equivalence calculation, and thus the value paid—$90,000 for a home valued at $136,150, falls short of the 70 percent mark by approximately 4 percent.  Accordingly, were the Court to apply the so-called *Madrid* rule, it would do so to Defendant's disappointment.

MEMORANDUM OF DECISION – 21

### 2. *Debtor's insolvency*

In order to prevail, Plaintiff must also prove that the transfer occurred either while the Debtor was insolvent, or that the Debtor was rendered insolvent as a result of the transfer. § 548(a)(1)(B)(ii). The Code defines "insolvent" as a "financial condition such that the sum of [Debtor's] debts is greater than all of [her] property, at a fair valuation, exclusive of . . . property transferred, concealed, or removed with intent to hinder, delay, or defraud [Debtor's] creditors . . . and property that may be exempted from property of the estate under section 522 of this title[.]" § 101(32)(A); *Fehrs,* 391 B.R. at 74.

The evidence adduced at trial shows that on November 30, 2017, the date of the Teton Property transaction, in addition to the Teton Property, Debtor owned the Kelly Property and believed she owed about the same amount and had the same equity as she did when she filed her bankruptcy petition the following June. The schedules establish that in June 2018, the Kelly Property was valued at $230,000 and Debtor owed $185,342 on the mortgage, leaving approximately $44,658 in equity. Debtor claimed the Kelly Property exempt on schedule C however, and thus the exempt equity would not be factored into her assets pursuant to § 101(32)(A). Debtor also listed $1,025 in personal property, $78 in a Farmer's Bank account,[6] and $2,000 in her husband's 401(k) account. Each of those assets were likewise claimed exempt; in addition, Debtor disclaimed any

---

[6] Her Farmer's Bank account had $51.32 on November 29, 2017, and $4,529.51 the following day after depositing two checks for $100 and $5,000 respectively. Ex. 210. The $5,000 check was the first payment from Defendant for the Teton Property.

MEMORANDUM OF DECISION − 22

interest in the 401(k) due to a prenuptial agreement between Debtor and Ford.  As such, aside from the Teton Property, for the purposes of a § 548 analysis, the value of Debtor's assets was $0.

On the liability side of the ledger, on November 30, 2017, Debtor was leasing a Toyota Rav 4, but was behind on the payments.  Her bankruptcy schedules reflect a deficiency owed on the Rav 4 in the amount of $7,288, and the Statement of Financial Affairs reflects that the vehicle was repossessed in May 2018.  Exs. 107; 203.  Debtor testified she was likely behind on the payments on November 30, 2017.  Finally, she listed $76,715 in unsecured debts on her bankruptcy schedules, which she testified was roughly the same as she had on November 30, 2017.

Other than the transfer of the Teton Property to Defendant, Debtor's Statement of Financial Affairs filed with the petition did not reflect any transfers within the period between November 30, 2017, and the bankruptcy filing on June 15, 2018.  This suggests no significant change of financial condition during that period and supports the conclusion that Debtor was insolvent on November 30, 2017, just as she was on the petition date.  The Court therefore agrees with Plaintiff's argument that the record shows that Debtor was insolvent on the date of the transfer.  *See Pierce*, 428 B.R. at 530.

Because the evidence shows that Debtor transferred the Teton Property within two years of the bankruptcy filing, she received less than equivalent value in exchange for the transfer, and she was insolvent on the date of the transfer, Plaintiff has proven all of the elements necessary under § 548(a)(1)(B).

MEMORANDUM OF DECISION − 23

C.    Innocent Transferee Defense

Defendant contends that he is an innocent transferee and protected by § 548(c).

That statute provides that "a transferee or obligee of such a transfer or obligation that

takes for value and in good faith has a lien on or may retain any interest transferred or

may enforce any obligation incurred, as the case may be, to the extent that such transferee

or obligee gave value to the debtor in exchange for such transfer or obligation."

Defendant bears the burden of proving that he is an innocent transferee. *In re Agric.*

*Research & Tech. Grp., Inc.*, 916 F.2d 528, 536 (9th Cir. 1990).  He must prove first that

he took the Teton Property in good faith and second that he gave value.  § 548(c); *In re*

*DBSI Inc.,* 593 B.R. 795, 827 (Bankr. D. Idaho 2018) ("the Bankruptcy Code insulates

the transferees of an avoided transfer who take for value and in good faith by providing

that such a transferee has a lien, or may retain the interest transferred, to the extent the

transferee gave "value to the debtor" in exchange for the transfer.")  Defendant's

arguments center entirely around the second prong of the analysis — that he gave value.

However, the difficulty for Defendant is the first required element, that of good faith.

"[I]f a transferee has knowledge of facts that would indicate a particular transfer

may be subject to avoidance by a bankruptcy trustee, and if further inquiry would reveal

that the transfer is in fact recoverable, the transferee cannot 'sit on his hands, thereby

preventing a finding that he has knowledge.'" *Fox Bean,* 287 B.R. at 283; *DBSI, Inc.*,

593 B.R. at 827–28 (citing 5 Collier on Bankruptcy ¶ 548.09[2][b], p. 548-102.2 (Richard

Levin & Henry J. Sommer, eds., 16th ed) (citations omitted)) ("[T]he presence of any

MEMORANDUM OF DECISION − 24

circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment."). In *Agritech*, the Ninth Circuit approached the issue of good faith with an inquiry into what the transferee "knew or should have known" in an objective rather than subjective sense, and concluded that, if the circumstances would have put a reasonable person on inquiry of the debtor's fraud and a diligent inquiry would have discovered the same, good faith is lacking. *DBSI, Inc.*, 593 B.R. at 827 (citing *Agritech*, 916 F.2d at 535–36.)

Defendant admitted at trial that Debtor regularly borrowed money from him and never paid it back. By his estimation, she owed him approximately $12,000 at the time of the transfer. In addition, she disclosed to Defendant that she could not afford the Teton Property. The Court finds this is sufficient evidence to place Defendant on inquiry as to Debtor's financial condition and negate Defendant's good faith transferee status resulting in a denial of the safe harbor defense.

/ / / / / /

MEMORANDUM OF DECISION – 25

### *Conclusion*

Plaintiff has demonstrated that Debtor sold the Teton Property to Defendant while she was insolvent and received less than reasonably equivalent value in return.  As a result, Plaintiff is entitled to avoid the transfer and recover the property under § 550.[7]

A separate order will be entered.

DATED:  January 6, 2021

_____
JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

---

[7] Plaintiff also argues the transfer of the Teton Property is a fraudulent transfer under Idaho Code § 55–913 made applicable through his § 544(b) powers.  The only particular difference between § 548(a)(1)(B) and Idaho Code § 55-913 is that the state law provides a four-year look-back period, as opposed to the two-year period under § 548(a).  Because the transfer at issue occurred less than two years before the bankruptcy filing, recourse to state law is unnecessary and that claim will not be further discussed.  *See Floyd*, 540 B.R. at 757.

MEMORANDUM OF DECISION − 26